MICHIGAN PORK PRODUCERS ASSOCIATION, INC., National Pork Producers Council, Pete Blauwiekel, Bob Bloomer, High Lean Pork, Inc., California Pork Producers, Kentucky Pork Producers, Indiana Pork Producers, New York Pork Producers, and Ohio Pork Producers, Plaintiffs,

v.

CAMPAIGN FOR FAMILY FARMS, Rodney Slater, James Dale Joens, Richard Smith, Rhonda Perry, Lawrence E. Giner, Jr., and Stan Scott Schutte, Defendant–Intervener/Cross–Complainants,

v.

Ann Veneman, Secretary of United States Department of Agriculture, and Kenneth Clayton, Acting Administrator, Agricultural Marketing Service, Defendants and Cross–Defendants.

No. 1:01–CV–34.

United States District Court, W.D. Michigan, Southern Division.

Dec. 4, 2001.

Robert Charles Timmons, Boyden, Timmons, Dilley & Haney, PLC, Grand Rapids, MI, Edward M. Mansfield, Belin Lamson McCormick Zumbach Flynn, Des Moines, IA, for Plaintiffs.

W. Francesca Ferguson, Charles R. Gross, U.S. Attorney's Office, Western District of Michigan, Grand Rapids, MI, William Rastetter, Olson & Bzdok, PC, Traverse City, MI, Patricia Leitner, U.S. Department of Justice Civil Division, Washington, DC, Christopher M. Bzdok, Olson, Noonan & Bzdok, PC, Traverse City, MI, David R. Moeller, Lynn A. Hayes, St. Paul, MN, for Defendants.

*OPINION*

ENSLEN, District Judge.

This matter is before the Court to determine four dispositive motions: (1) Defendants and Cross–Defendants Ann Veneman and Kenneth Clayton's Motion to Dismiss Cross–Complaint; (2) Cross–Complainants Campaign for Family Farms *et al.*'s Motion for Partial Summary Judgment; (3) Plaintiffs Michigan Pork Producers Association, Inc. *et al.*'s Motion for Summary Judgment on Count One; and (4) Defendants and Cross–Defendants Ann Veneman and Kenneth Clayton's Motion to Dismiss Defendant–Inventors/Cross–Complainants' Record–Based APA Cross–Claim. The Motions have now been fully briefed. In light of the extensive briefing and the Court's past experience with this case, the Court determines that oral argument would not assist the Court in decision making and would unnecessarily protract the resolution of these motions.

*PROCEDURAL BACKGROUND*

In 1985, Congress enacted the Pork Promotion, Research and Consumer Education Act ("Pork Act") 7 U.S.C. § 4801, *et seq.* The Act was enacted as part of the Food Security Act of 1985, which included both the Pork Act and the Watermelon Act. The Act created a Pork Program, which provides a large number of pork promotion, research and education programs to benefit pork producers. These efforts are funded by an assessment of less than one-half of one percent on the value of pigs and pork products sold. The Program pays for these promotions and employs approximately 200 persons, in addition to contractors. In accordance with the Pork Act, an initial Pork Promotion Order (establishing the Program) was issued by the Secretary in 1986. After this,

in accordance with the statute, an initial referendum on the Program was conducted among pork producers in 1988 and the producers initially approved the Program by a vote of 77.5 percent in favor of the Program. (Tank Affidavit at ¶ 7; Dkt. No. 72 at 4.)

In May 1999, the Campaign for Family Farms, after soliciting signatures, turned in petitions seeking a mandatory and binding referendum on the termination of the Program under 7 U.S.C. § 4812(b)(1)(A). This portion of the statute requires a binding referendum be made among pork producers provided that fifteen percent of pork producers have petitioned for the referendum. Upon verification of the petitions, the United States Department of Agriculture ("USDA") apparently determined that the petitions submitted did not meet the 15 percent threshold. This determination was somewhat clouded, however, in that the USDA admitted that the "verification process was vulnerable to criticism . . . ." (Glickman Memorandum of February 25, 2000.)

Because of the problems in the verification process, former Secretary of Agriculture Glickman determined on February 25, 2000 that he would conduct a voluntary, "fairness" referendum to determine whether to terminate the program. (*Id.*) This decision was later published as part of an administrative rule (to be published in the Code of Federal Regulations) in order to provide notice to affected persons and the public at large. 65 F.R.43,498 (July 13, 2000).

On January 11, 2001, Secretary Glickman announced that 15,951 had voted against the Program and 14,396 had voted for the Program, and that the Program would be terminated consistent with his earlier announcement. Plaintiffs then filed suit on January 12, 2001 to both challenge the counting of the votes and to challenge the legality of termination based upon such a "voluntary" referendum. Plaintiffs also moved for a temporary restraining order and preliminary injunction to forbid the USDA from terminating the program pending the resolution of the suit. On January 19, 2001, after receiving a response from the USDA, the Court issued a Temporary Restraining Order pending hearing of the preliminary injunction motion.

The preliminary injunction hearing contemplated never occurred because, in the interim, there was a change in administration at the USDA and counsel representing the newly appointed Secretary, Secretary Ann Veneman, determined not to terminate the Pork Program based on the voluntary referendum. This decision was contained in a settlement agreement reached on February 28, 2001. In addition to providing that the Pork Program would not be terminated based on the voluntary referendum, the settlement agreement determined that funds from the Pork Program would be directly administered by the National Pork Board (whose members are appointed by the Secretary) instead of the National Pork Producers Council.

Thereafter, Plaintiffs filed an Amended Complaint which sought a declaratory judgment on Count One that the settlement reached on February 28, 2001 was lawful. The Intervener Defendants then cross-claimed against the original Defendants for the purpose of challenging the legality of the settlement. Since then, both the Complaint and the Counterclaims have been supplemented to add additional plaintiffs and to assert additional claims (especially including the cross-claim that the "forced" commercial speech violates the First Amendment as stated in *United States v. United Foods, Inc.*, 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438

(2001)). (*See* Order of Sept. 5, 2001; First Supplemental Cross–Claim of September 27, 2001.)

### STANDARD FOR SUMMARY JUDGMENT

Under the language of Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[1] The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions. *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir.1994). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir.1995) (quoting Federal Rule of Civil Procedure 56(c)). Moreover, affidavits must meet certain requirements:

> [A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed.R.Civ.P. 56(e). The Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir.1993). Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *Id.*, unsworn statements, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–969 (6th Cir.1991), inadmissible expert testimony, *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280 (6th Cir.1997),

---

1. The governmental Defendants have moved for dismissal of the cross-complaint as opposed to summary judgment. Nevertheless, the use of the summary judgment standard is appropriate because the motion raises and relates to documents and evidence outside the pleadings. See Fed.R.Civ.P. 12(b). Also, this Court's conclusions as to dismissal would not change even were the Rule 12 standards employed since this motion turns on questions of law concerning the referendum rule.

or hearsay evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996); *Wiley v. United States*, 20 F.3d 222, 225–226 (6th Cir.1994).

### LEGAL ANALYSIS

#### A. Motion to Dismiss Record–Based A.P.A. Cross–Claim

Cross–Defendants have moved to dismiss those of Defendant Interveners' cross-claims which are based on the legal theory that the decision of the Secretary not to suspend the operation of the program was "arbitrary and capricious" in violation of the Administrative Procedures Act. The basis for the Motion is that the production of the underlying administrative record has already been enjoined by courts within the Eighth Circuit Court of Appeals and, as such, it will be impossible to show that the action taken was arbitrary or capricious. This Court now understands (based on court conferences between the parties and Magistrate Judge Ellen S. Carmody and the Order of November 27, 2001) that the Defendant Interveners are attempting to obtain a modification of the injunction to allow the production of the administrative record in this case. Therefore, the Motion to Dismiss will be denied without prejudice to permit the parties to attempt to file the administrative record with this Court. This Motion may be renewed should the filing of the record prove unsuccessful.

#### B. Remaining Motions

Defendants have also moved to dismiss a cross-claim by Defendant Interveners which was based on the theory that the USDA was required as a matter of law to terminate the Pork Checkoff Program based on the referendum · rule and an-

nounced vote. This Motion raises identical issues as are raised in Plaintiff's Motion for Summary Judgment on Count One and Defendant Interveners' Motion for Partial Summary Judgment.

■■■ A review of the briefing discloses that all of the legal claims asserted as to these Motions surround one issue—whether the referendum rule required the Secretary as a matter of law to terminate the Pork Checkoff Program upon receipt of the voluntary, producer vote in favor of termination. If this were required as a matter of law, then non-termination was an actionable violation of the Administrative Procedures Act because it was "not in accordance with law." *See* 5 U.S.C. § 706. If it were not required, then the non-termination was "in accordance with law" within the meaning of the A.P.A.[2] Plaintiffs answer this question in the negative as do Cross–Defendants (for different reasons). Defendant Interveners take the position that the referendum rule required termination as a matter of law.

#### 1. Statutory and Regulatory Language

This discussion must begin by reference to both the pertinent statutes and the referendum rule. Congress' stated purposes in enacting the Pork Act were as follows:

> (b)(1) It is the purpose of this chapter to authorize the establishment of an orderly procedure for financing, through adequate assessments, and carrying out an effective and coordinated program of promotion, research, and consumer information designed to—
>
> > (A) strengthen the position of the pork industry in the marketplace; and

---

**2.** It is clear from the briefing that any "arbitrary and capricious" challenges to the Agency's conduct must await another day when

there is an administrative record for review. Thus, the Court reserves judgment on any such claims.

(B) maintain, develop, and expand markets for pork and pork products.

(2) Such procedure shall be implemented, and such program shall be conducted, at no cost to the Federal Government.

(3) Nothing in this chapter may be construed to—

(A) permit or require the imposition of quality standards for pork or pork products;

(B) provide for control of the production of pork or pork products; or

(C) otherwise limit the right of an individual pork producer to produce pork and pork products.

7 U.S.C. § 4801(b).

To accomplish this purpose, Congress delegated the Secretary the following authority:

(a) To carry out this chapter, the Secretary shall, in accordance with this chapter, issue and, from time to time, amend orders applicable to persons engaged in—

(1) the production and sale of porcine animals, pork, and pork products in the United States; and

(2) the importation of porcine animals, pork, or pork products into the United States.

(b) The Secretary may issue such regulations as are necessary to carry out this chapter.

7 U.S.C. § 4803.

Furthermore, Congress delegated authority to the Secretary to suspend or terminate the operation of any order issued:

(a) Authority of Secretary

If after the initial referendum provided for in section 4811(a) of this title the Secretary determines that an order, or a provision of the order, obstructs or does not tend to effectuate the declared policy of this chapter, the Secretary shall terminate or suspend the operation of such order or provision.

(b) Referendum to terminate or suspend; eligible voters; requirements for approval; termination or suspension date; one referendum within 2–year period

(1)(A) Except as provided in paragraph (2), after the initial referendum provided for in section 4811(a) of this title, on the request of a number of persons equal to at least 15 percent of persons who have been producers and importers during a representative period, as determined by the Secretary, the Secretary shall conduct a referendum to determine whether the producers and importers favor the termination or suspension of the order.

(B) The Secretary shall—

(i) suspend or terminate collection of assessments under the order not later than 6 months after the date the Secretary determines that suspension or termination of the order is favored by a majority of the producers and importers voting in the referendum; and

(ii) terminate the order in an orderly manner as soon as practicable after the date of such determination.

(2) Except with respect to a referendum required to be conducted under section 4811 of this title, the Secretary shall not be required by paragraph (1) to conduct more than one referendum under this chapter in a 2–year period.

(c) Termination or suspension not to be considered an order

The termination or suspension of an order, or a provision of an order, shall not

be considered an order within the meaning of this chapter.

7 U.S.C. § 4812. Other important sections of the statute include: 7 U.S.C. § 4811 (requiring an initial referendum as to the program); 7 U.S.C. §§ 4804–5 (relating to the Secretary's initial order to establish the program); 7 U.S.C. § 4809(b)(3) (allowing rate amendment of rates above one half of one percent upon vote of delegate body and approval by referendum).

Announcement of the referendum rule was made in the Federal Register. The lengthy announcement included a regulatory definition for the referendum:

§ 1230.617   Referendum.

The term Referendum means any referendum to be conducted by the Secretary pursuant to the Act whereby persons who have been producers and importers during a representative period would be given the opportunity to vote to determine whether producers and importers favor continuation of the Order.

65 Fed.Reg. 43498, 45,308 (July 13, 2000) (to be codified at 7 C.F.R. pt. 1230). The announcement also explained the referendum as follows:

§ 1230.622   General.

(a) A referendum to determine whether eligible pork producers and importers favor continuation of the Pork Checkoff Program will be conducted in accordance with this subpart.

(b) The Pork Checkoff Program will be terminated only if a majority of producers and importers voting in the referendum favor such termination.

(c) The referendum will be conducted at the county FSA offices for producers and at FSA headquarters office in Washington, DC, for importers.

65 F.R. at 43,509.

### 2.   Precedent and Analysis

One starting place for this discussion is the language of the referendum rule itself, which is quite lengthy. This language is, at best, ambiguous in that while some of the language indicates that the Secretary will terminate the program "if" producers approve termination, *see* 65 F.R. at 43498, 43507 and 43509, other language of the rule indicates that the program will be terminated "only if" the vote is in favor of termination. The codified portion of the referendum rule utilizes the "only if" language. This language can be read in one of two fashions: as making a "yes" vote a necessary but not a sufficient condition for termination; or as making it a necessary and sufficient condition for termination. Which interpretation should be adopted is perfectly ambiguous from the referendum rule itself. While its purpose was to decide the termination issue so as to remedy controversy caused by the previous petition drive, this purpose must be reconciled with the statutory backdrop for the Program, including sections 4803 and 4812 of the Act, which provides the Secretary with ultimate and discretionary authority to both make, suspend and terminate administrative orders in order to advance the purposes of the Act.

Given the Secretary's necessary discretion in administrating the Act, the best reading of the referendum rule is that it permits, but does not require, the termination of the Program upon an affirmative vote of producers. This reading avoids the pitfalls associated with the opposite conclusion. It does not posit a "mandatory" referendum for which the Secretary had no statutory authority to authorize. *See infra.* Under the statutory scheme, the Secretary, and not producers, is required to make decisions relating to the suspension and termination of the Program. *See* 7 U.S.C. § 4812(a). Section 4812 makes sufficiently clear Congress' intention that the Secretary (other than in the three

instances of mandatory referenda given in the statute) always exercises the termination authority for the purposes stated in the Act and not cede this authority to others. *See Freytag v. Commissioner,* 501 U.S. 868, 877, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (affirming the Supreme Court's " 'deep reluctance to interpret a statute so as to render superfluous other provisions in the same enactment.' ") (citations omitted); *United Food.& Commercial Workers Union Local 751 v. Brown Group,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (approving statutory interpretations which give effect to all pertinent sections of the statute).

Another way to make this point is that since the statute affords the Secretary the discretion to make policy decisions, it also requires the Secretary to exercise that discretion in every instance consistent with the goals of the Act. A referral of the decision to producers (aside from that called for by the statute as to mandatory referenda), even if supported by facts at the time of referral, would be improper because the statute contemplates that the Secretary must consider how the action will effectuate the goals of the Act at the time the action is taken. This includes, necessarily, a consideration of any market changes which intervene between the referendum rule and the time of vote.

In fact, as indicated in the United States Supreme Court's decision in *American Trucking Associations v. A.T. & S.F.R. Co.,* 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), the power and duty of the agency to consider and reconsider its policy decision is a hallmark of our administrative law:

In fact, although we make no judgment as to the policy aspects of the Commission's action, this kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.

*American Trucking Associations,* 387 U.S. at 416, 87 S.Ct. 1608. *See also Gorbach v. Reno,* 179 F.3d 1111, 1123 & n. 16 (9th Cir.1999) (holding that agency may reconsider its decisions " 'regardless of whether applicable statute and agency regulations expressly provide for such review.' ") (citations omitted); *Michigan v. Thomas,* 805 F.2d 176, 184 (6th Cir.1986); *Gun South, Inc. v. Brady,* 877 F.2d 858, 862 (11th Cir.1989) (citing cases). Indeed, federal courts have expressly authorized agency action taken to avoid protracted litigation. *See, e.g., United States ex rel. Sequoia Orange Co. v. Sunland Packing House Co.,* 912 F.Supp. 1325, 1346 (E.D.Cal.1995), *aff'd,* 151 F.3d 1139 (9th Cir.1998).

Furthermore, the authority of the Secretary to change policy is especially great in the context of a change in political administrations. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 59, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). As the Supreme Court said in the *Motor Vehicle* decision, changes in policies as a consequence of citizens casting votes is a perfectly reasonable basis for executive action. *Id.* Indeed, were it not so, our democracy and suffrage would be the less for it since the moribund rules of impersonal governmental agencies would lie immune from the popular will.

■ Implicit in the above discussion is the concept that where specific statutory

language is used to describe those conditions under which "binding referenda" should take place, the use of binding referenda is limited to those conditions. This is simply a straight forward application of the principle of legal construction known as *expressio unius est exclusio alterius* ("the express of one is the exclusion of others"). *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *TRW Inc. v. Andrews,* —— U.S. ——, ——, 122 S.Ct. 441, 447, —— L.Ed.2d ——, —— (2001); *Millsaps v. Thompson,* 259 F.3d 535, 546–47 (6th Cir.2001). The application of that principle is often controversial and is inappropriate in cases where the surrounding context does not support the principle. *See* Reed Dickerson, *The Interpretation and Application of Statutes,* 234–35 (1975). However, in this case, the context supports its application because the grant of termination authority to producers is so extraordinary in character that Congress could not have intended that this authority be granted to private citizens other than as it specifically directed in the statute.

■ Additionally, this reading of the statute, as permitting a discretionary, nonbinding referendum, but disallowing a binding referendum, is consistent with case precedent. Federal precedent restricts the ability of agencies to delegate executive and/or legislative responsibilities to persons outside the executive branch in the absence of a grant of authority by Congress to delegate those responsibilities in manners previously allowed by the Supreme Court. A fair statement of the law was made by the District of Columbia Circuit in *Perot v. Federal Election Comm'n,* 97 F.3d 553, 559 (D.C.Cir.1996):

It is well established that Congress may, by a legislative act, grant authority to an executive agency such as the FEC to adopt rules and regulations, so long as it provides some "intelligible principle" by which the agency is to exercise that authority. *Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 654–55, 102 L.Ed.2d 714 (1989) (quoting *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928)). We agree with the general proposition that when Congress has specifically vested an agency with the authority to administer a statute, it may not shift that responsibility to a private actor such as the CPD. *Cf. A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 537, 55 S.Ct. 837, 846, 79 L.Ed. 1570 (1935).

*Id.* at 559.

Another fair statement of these principles was made in *National Ass'n of Reg. Util. Com'rs v. Federal Communications Comm'n,* 737 F.2d 1095, 1143 n. 41 (D.C.Cir.1984):

We also caution the Commission that it cannot, of course, cede to private parties such as the exchange carriers either the right to decide contests between themselves and their opponents or even the opportunity to narrow the margins of the debate regarding access charges for private systems. API seriously contends that the Commission is unlawfully delegating agency authority. *See* Brief for API at 42, n. 40, citing *Sierra Club v. Sigler,* 695 F.2d 957, 963, n. 3 (5th Cir. 1983). Such argument is typically presented in the context of a transfer of legislative authority from the Congress to agencies, but the difficulties sparked by such allocations are even more prevalent in the context of agency delegations to private individuals.

*Id.* at 1143. *See also Riverbend Farms, Inc. v. Madigan,* 958 F.2d 1479, 1488 (9th Cir.1992) (stating that "the Secretary is free to seek advice from whatever sources

he deems appropriate, so long as he or his delegate in the Department retains ultimate authority to issue the regulation."); *Leathers v. Gulf Rice Arkansas, Inc.*, 338 Ark. 425, 994 S.W.2d 481 (1999) (holding that it was an unconstitutional delegation of authority to allow referendum of rice producers as to fees to be paid by rice buyers).

It is true that the Supreme Court has on many occasions upheld, under the United States Constitution, the delegation of a Secretary's authority to private actors, in many cases commodity producers, when done in accordance with the specific directions of Congress. *See Currin v. Wallace*, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939); *United States v. Rock Royal Co-Op*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917); *see also Kentucky Div., Horsemen's Benevolent & Protective Ass'n v. Turfway Park Racing Association, Inc.*, 20 F.3d 1406 (6th Cir.1994); *United States v. Frame*, 885 F.2d 1119 (3rd Cir.1989). However, in each of these cases, the delegation was done in accordance with specific statutory directions and was done to accomplish limitations on the exercise of governmental power. The specific statutory directions in the Pork Act for a binding referendum include no authority for the Secretary to have conducted the "fairness" referendum as a "binding" referendum. This Court (like the Secretary) reads the authorizations for delegation in the Act

narrowly, consistent with the principles of the non-delegation doctrine, for the purpose of preserving the Separation of Powers and the political accountability intended by the Constitution.

Finally, this interpretation of the statutory framework as allowing both a discretionary and non-binding referendum and allowing the Secretary to exercise discretion in evaluating whether to terminate the Order establishing the Program is consistent with principle that agency interpretations are entitled to deference given the "specialized experience and broader investigations and information" available to the agency. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 2175, 150 L.Ed.2d 292 (2001) (quoting *Skidmore*). Thus, the Secretary's statutory interpretation is entitled to *Skidmore* deference, and also *Chevron* deference.[3] *See Chevron U.S.A., Inc. v. Natural Resources Defense, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). In this case, the Secretary's interpretations of the statutes referenced are reasonable and are entitled to deference. This deference is not granted because of high office, but because of the expertise and experience of the Department making the interpretation and because of the necessity to accord deference to the execu-

**3.** In *Mead,* the Supreme Court noted that *Skidmore* deference was appropriate even in cases where *Chevron* deference did not apply (*i.e.,* where the statute did not assign rule making authority to the agency). In this case, the Pork Act provided the Secretary with rule making authority and the Secretary's statutory interpretations must be viewed in this light. *See* 7 U.S.C. § 4803. With this said, however, the standard for deference is ultimately unnecessary to this issue because the interpreta-

tions adopted would be adopted by this Court even in the absence of any kind of deference. The Court also notes for fairness sake that less deference is due the agency in a case like this one—where the agency interpretation has not been consistently followed by the agency. However, some deference is still appropriate especially in light of the fact that the agency must come to its conclusions by weighing competing concerns in the midst of litigation.

tive branch to assist it in carrying out the duties of government.

This interpretation does bear some weaknesses, though. It makes the referendum rule a "false promise" to pork producers who assumed that it was binding in casting their preferences. This is regrettable. However, in the Court's judgment, it is far better than the opposite conclusion. The opposite conclusion would make the statutory promise enacted by Congress that the Secretary act at all times, in suspending or terminating orders, to fulfill the purposes of the Act a false promise. This is far worse, given the greater importance of the legislative process (over the rule making process in question), and given the necessary importance that the assigned member of the Executive Branch have the authority intended by Congress to make the Program successful.

Another "weakness" of this Court's position is that it disagrees slightly with some of the rationale stated in this Court's decision on the Motion for Temporary Restraining Order. In the previous Opinion, this Court opined that it was unlikely that Congress intended to allow a discretionary referendum among Pork Producers given that no provision is made for such a referendum in the Pork Act and given that the Watermelon Act (enacted at the same time) explicitly allows for such referenda at the option of the Secretary. The problem in comparing these provisions is that

they are apples and oranges, or more properly, hogs and watermelon. The pertinent language of the Watermelon Act, section 4913, expressly requires the termination of the Watermelon Program upon any affirmative vote of producers in referenda, whether the referenda are caused by a petition drive or merely by the exercise of the Secretary's discretion. No language in either the Pork Act or the Watermelon Act creates the inference that the Secretary is prevented at any time, as to the Pork Program, to conduct a non-binding, discretionary referendum for the purpose of discovering producer preference and then factoring that information into the Secretary's management decisions.[4] Since this kind of information is crucial to any executive assigned the task of management, the Court is now loath to conclude that a non-binding and voluntary referendum was impermissible under the statute in the complete absence of statutory language directing that result. The Court makes this conclusion clear for the purpose of clarifying its earlier Opinion, which was preliminary by nature.[5] In saying so, the Court does not depart from, and restates its earlier position that the statute limited the authority of the Secretary to conduct "binding" referenda to those instances expressly mentioned in the statute ("initial referendum," "petition drive" and "rate modification").[6]

4. The conclusion of the Secretary as to his statutory authority under section 4012 was shared by the General Accounting Office in its Report to Congress on September 28, 2000. (G.A.O. Report at 12–13, attached to Dkt. 87, exhibit 3.) The Court recognizes that the views of the GAO are not entitled to *Chevron* deference because they are not an executive agency. Nevertheless, this does show that an independent body examined the pertinent statutes and came to the same statutory construction as did the Secretary.

5. Ralph Waldo Emerson is famous for having said, "A foolish consistency is the hobgoblin of little minds." That line bears repeating here since it is better to correct one's errors than to repeat them for consistency's sake.

6. A fourth possibility for a "binding" referendum is in the context of 7 U.S.C. § 4818, which permits a binding referendum to "amend" a previous order. However, the Secretary limits the meaning of this section as an "administrative" section which permits "binding" amendment only in the three contexts discussed above. *See* 7 U.S.C. §§ 4818;

Finally, this Court must dispel one argument advanced by Defendant Interveners. They argue, in part, that there was a Congressional ratification of the binding nature of the referendum rule in that Congress later appropriated funds to pay for the referendum which already had occurred. This argument fails in at least two respects. First, because the Court has read the referendum rule as non-binding, even if it were ratified by Congress it would not reflect an intent to terminate the Program. Second, as a factual matter, the authorization which occurred cannot be reasonably construed as a ratification for termination. *See* Sec. 316 of Public Law 106–472, 114 Stat.2058, 2081–82 (Nov. 9, 2000). The referendum had already occurred at the time of the authorization. The authorization in question required the Secretary to use agency funds from other appropriations instead of either making a new ear-marked appropriation or requiring pork producers to fund the referendum. Viewed in this light the appropriation, to the extent that it indicates anything, indicates Congressional disapproval as to the conduct of the referendum.

### CONCLUSION

Accordingly, a Partial Judgment shall enter granting Ann Veneman and Kenneth Clayton's Motion to Dismiss (for summary judgment) as to the cross-claim of Defendant Interveners based on the argument that the referendum rule and announced vote required Program termination as a matter of law. The Partial Judgment shall also grant summary judgment to Plaintiffs and declare as a matter of law that the referendum rule and announced vote did not require Program termination. The

*see also* 7 U.S.C. § 4811(e). The Court sees no sufficient reason to disagree with this con-

Partial Judgment shall also deny Defendant–Interveners Motion for Partial Summary Judgment and Defendants Ann Veneman and Kenneth Clayton's Motion to Dismiss Defendant–Inventors/Cross–Complainants' Record–Based APA Cross–Claim. This decision has no effect on the record-based claims of the parties nor on the First Amendment claims of the parties. It is also not a final decision for the purposes of Federal Rule of Civil Procedure 54(b).