*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0373P (6th Cir.)
File Name: 03a0373p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――

No. 02-2337

MICHIGAN PORK PRODUCERS
ASSOCIATION, INC., et al.,
  *Plaintiffs,*

  Nos. 02-2337/2338

*v.*

ANN M. VENEMAN, Secretary,
United States Department of
Agriculture, et al.,
  *Defendants-Appellants,*

CAMPAIGN FOR FAMILY
FARMS, an Unincorporated
Association of Membership
Organizations,
  *Defendant-Appellee.*

―――――――

No. 02-2338

MICHIGAN PORK PRODUCERS
ASSOCIATION, INC., et al.,
  *Plaintiffs-Appellants,*

*v.*

ANN M. VENEMAN, Secretary,

2    *Mich. Pork Producers Ass'n,*    Nos. 02-2337/2338
     *et al. v. Veneman, et al.*

United States Department of
Agriculture, et al.,
  *Defendants-Appellees,*

CAMPAIGN FOR FAMILY
FARMS, et al.,
  *Intervenors-Appellees.*

―――――――

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 01-00034—Richard A. Enslen, District Judge.

Argued: March 14, 2003

Decided and Filed: October 22, 2003

Before: COLE, GILMAN, and BRIGHT, Circuit Judges.[*]

―――――――

## COUNSEL

**ARGUED:** Matthew M. Collette, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., Susan E.
Stokes, FARMERS LEGAL ACTION GROUP, INC., St.
Paul, Minnesota, for Defendants. Edward M. Mansfield,
BELIN LAMSON McCORMICK ZUMBACH FLYNN, Des
Moines, Iowa, for Plaintiffs. **ON BRIEF:** Matthew M.
Collette, Douglas N. Letter, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., Susan E.
Stokes, David R. Moeller, FARMERS LEGAL ACTION

―――――――――――

[*]The Honorable Myron H. Bright, Senior Circuit Judge of the United
States Court of Appeals for the Eighth Circuit, sitting by designation.

GROUP, INC., St. Paul, Minnesota, for Defendants. Edward M. Mansfield, BELIN LAMSON McCORMICK ZUMBACH FLYNN, Des Moines, Iowa, Robert Charles Timmons, BOYDEN, TIMMONS, DILLEY & HANEY, Grand Rapids, Michigan, for Plaintiffs.

———————————

**OPINION**

———————————

R. GUY COLE, JR., Circuit Judge.    Michigan Pork Producers Association, Inc., et al. ("MPPA") and the Secretary of Agriculture (the "Secretary") (collectively "Appellants") appeal the grant of summary judgment to Appellees Campaign for Family Farms, et al. ("CFF"). The United States District Court for the Western District of Michigan declared the Pork Promotion, Research and Consumer Information Act (the "Pork Act"), 7 U.S.C. § 4801 *et seq.*, and the Pork Promotion Order issued thereunder, 7 C.F.R. § 1230, unconstitutional and issued an injunction terminating all activities under the Pork Act and the Pork Promotion Order. The Act mandates that pork producers and importers (collectively "pork producers") pay assessments, known as "checkoffs," to fund promotion, research, and consumer information to benefit the pork industry.

The district court held that requiring the payment of these assessments violates the First Amendment rights of pork producers by compelling them to subsidize speech with which they do not agree. Appellants argue that: (1) the assessments subsidize a government program that advances the government's policy of promoting pork consumption, and, therefore, are immune from First Amendment scrutiny; (2) even if not part of a government program, the assessments are not compelled speech; (3) the Pork Act program that requires the collection of assessments, is a lawful restraint on commercial speech; and (4) even if the use of assessments for

promotion under the Pork Act violates the First Amendment, the injunction ordered by the district court is overly broad in that it eliminates funding for programs that are constitutional.

For the reasons stated below, we **AFFIRM** the grant of summary judgment by the district court.

## I. BACKGROUND

As part of the Food Security Act of 1985, Congress enacted the Pork Act. The purpose of the Pork Act is to:

> [A]uthorize the establishment of an orderly procedure for financing, through adequate assessments, and carrying out an effective and coordinated program of promotion, research, and consumer information designed to—
> (A) strengthen the position of the pork industry in the marketplace; and
> (B) maintain, develop, and expand markets for pork and pork products.

7 U.S.C. § 4801(b)(1). The Pork Act provides for the creation of a National Pork Producers Delegate Body ("Delegate Body"). 7 U.S.C. § 4806. The Delegate Body – which determines the amount and distribution of the assessments – consists of pork producers, who are nominated by the state pork producers associations and appointed by the Secretary, and pork importers, who are appointed by the Secretary based on the amount of assessments collected from importers. 7 U.S.C. § 4806(b)(1). The Pork Act also provides for the creation of a 15-member National Pork Board ("the Board"), 7 U.S.C. § 4808 (a)(1), whose nominees are chosen by the Delegate Body and appointed by the Secretary. The Board is to develop and implement programs that fulfill the statutory mandates of promotion, research, and the provision of consumer information. 7 U.S.C. § 4808(b)(1). Although the United States Department of Agriculture ("USDA") provides some oversight over the Board, its Executive Vice President

noted that it "is not to be considered as a governmental entity/agency or a government contractor." Morever, the members of the Board receive no compensation from the government, and are reimbursed for expenses from the collected assessments. 7 U.S.C. § 4808(a)(1)(6).

Because the Pork Act explicitly states that its programs "shall be conducted at no cost to the Federal Government," 7 U.S.C. § 4801(b)(2), the Act provides for funding through mandatory assessments. 7 U.S.C. § 4809 *et seq.* In accordance with the provisions of the Pork Act, an initial Pork Promotion Order, establishing the Pork Checkoff Program, was issued by the Secretary in 1986. An initial referendum on the Pork Checkoff Program was held in 1988, and it was approved with the support of nearly eighty percent of pork producers. Payments are assessed against all producers of porcine animals that are sold or slaughtered for sale, and all importers of porcine animals, pork, or pork products.[1] 7 U.S.C. § 4809 (a)(1). The Board receives all assessments, and distributes them according to formulas detailed in the Pork Act. Although most of the funds support generic advertising, some of the money is spent to promote specific brands of pork products.

CFF, a non-profit advocacy group consisting of a coalition of four family farm organizations as well as individual hog farmers, is devoted to "ensuring the continued existence of family farms, particularly hog farms." Since 1998, CFF's primary goal has been to end the Pork Checkoff Program. CFF believes that the advertising funded by the Pork Checkoff Program favors those who sell processed meats, misrepresents the safety and desirability of large commercial farming, and downplays the benefits of family farms. In May

---

[1]In 2002, the Farm Security and Rural Investment Act of 2002 was passed, exempting organic hog farmers from paying the assessments. Pub. L. No. 107-171, §1(a), 116 Stat. 134 (2002).

1999, after CFF filed petitions with the USDA seeking a referendum on the termination of the Pork Checkoff Program, then-Secretary Glickman decided to conduct a voluntary, "fairness" referendum on the checkoff program's future.

On January 11, 2001, Secretary Glickman announced that a majority of individuals had voted to terminate the program, and that as a result, he would terminate it. MPPA filed suit the next day to enjoin the program's termination. *Mich. Pork Producers Ass'n, Inc. v. Campaign for Family Farms*, 174 F. Supp. 2d 637, 639 (W.D. Mich. 2001) ("*MPPA I*"). On January 19, 2001, the district court issued a temporary restraining order pending hearing of the preliminary injunction motion. *Id.* Between the restraining order and the scheduled hearing, newly-appointed Secretary of Agriculture Veneman decided to preserve the Pork Checkoff Program, albeit with the funds collected by the Pork Checkoff Program administered directly by the Board instead of by the NPPC.

On June 25, 2001, the Supreme Court in *United States v. United Foods*, 533 U.S. 405 (2001), invalidated – as contrary to the First Amendment's prohibition against compelled speech – the Mushroom Checkoff Program created by the Mushroom Promotion, Research, and Consumer Information Act, 7 U.S.C. § 610 *et seq.* (the "Mushroom Act"). Like the Pork Act, the Mushroom Act required producers and importers of mushrooms to pay assessments that were primarily used to fund generic advertising that promoted the sale of mushrooms. CFF subsequently added to its complaint a First Amendment challenge to the Pork Act. *MPPA I*, 174 F. Supp. 2d at 639. On December 4, 2001, the district court upheld the legality of Secretary Veneman's decision to preserve the Pork Checkoff Program. *MPPA I*, 174 F. Supp. 2d at 643-44. The court explicitly stated, however, that its ruling had no effect on the other claims of the parties, including CFF's First Amendment challenges. *Id.* at 648.

CFF then voluntarily dismissed all of its remaining challenges to the Pork Checkoff Program, save for its First Amendment claims. *Mich. Pork Producers Ass'n, Inc. v. Campaign for Family Farms*, 229 F. Supp. 2d 772, 777 (W.D. Mich. 2002) ("*MPPA II*"). The parties filed cross-motions for summary judgment. On October 25, 2002, the district court granted CFF's summary judgment motion, holding that the First Amendment prohibited the Pork Checkoff Program and enjoining it in its entirety. *Id.* at 792. MPPA and the Secretary filed timely Notices of Appeal, and this Court subsequently granted a stay of the district court's injunction pending the appeal.

## II. ANALYSIS

### A. Standard of Review

We review the district court's grant of summary judgment *de novo. See Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). Summary judgment is granted when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. Standing

Plaintiffs have standing under Article III to challenge the Pork Act. MPPA challenges the standing of CFF, claiming that: (1) several named appellees lacked standing because they do not pay assessments under the Pork Act and are unaffected by these provisions of the Pork Act requiring such payments; and (2) CFF does not have standing as an association under the test articulated in *Hunt v. Wash. Apple Adver. Comm.*, 432 U.S. 333, 343 (1977). In its brief to this Court, however, MPPA concedes that "two individuals, Mr. Smith and Mr. Jones, had standing to pursue their claims."

Since at least one appellee in this action has standing, there is no need to consider MPPA's standing challenges to the individual appellees or to CFF. *See, e.g. Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (explaining that if one plaintiff has standing, it is unnecessary to consider the issue of standing as to other plaintiffs in the action).

### C. First Amendment Challenge

#### 1. Governmental Speech

We first consider whether the subsidies generated under the Pork Act are properly analyzed as private speech or as governmental speech. The Supreme Court has made clear that the government may dictate the content and even the viewpoint of speech when the government itself is the speaker: "[V]iewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker...." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001). But the Court has yet to consider whether programs similar in nature to the Pork Checkoff Program constitute governmental speech – the Court declined to do so in *United Foods* because the government had failed to raise the governmental speech argument in the court below. *United Foods*, 533 U.S. at 417.

We conclude that the pork industry's extensive control over the Pork Act's promotional activities prevents their attribution to the government. First, the primary purpose of the Pork Act is to strengthen the market position of the pork industry and increase the domestic markets for pork and pork products. 7 U.S.C. § 4801. *See Keller v. State Bar of Cal.*, 496 U.S. 1, 13 (1990) (categorizing as private the speech of an organization created "not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession."). Second, unlike the typical scenario in which speech is considered governmental in nature, the programs'

funding does not come from general tax revenues. *See, e.g., Rust v. Sullivan*, 500 U.S. 173 (1991); *Wells v. City and County of Denver*, 257 F.3d 1132 (10th Cir. 2001); *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000), *cert. denied*, 532 U.S. 994 (2001). The Pork Act's funding comes solely from mandatory assessments paid by pork producers; the Act specifically forbids the use of government funds for its operations, and the Secretary and her staff are reimbursed from the assessments for any time spent working on activities under the Pork Act. 7 C.F.R. § 1230.73(c)(4).

Third, the government exercises only limited oversight over the programs. *See United Foods*, 533 U.S. at 417 (suggesting that merely *pro forma* government oversight over a promotional program counsels against classifying it as governmental speech). Only one USDA staff member is responsible for overseeing all of the duties relating to the Pork Checkoff Program, including attending all meetings of the Pork Board and reviewing all advertisements and communications it develops. The government itself does not propose or draft any of the advertisements. Indeed, the trademark for the most recognizable ad, "Pork. The Other White Meat," is owned by the NPPC, not the government. The Pork Board itself is comprised only of private pork producers, appointed by the Secretary based on nominations made by the private state pork producers associations – which themselves are run entirely by industry officials.

In sum, the costs and content of the speech in question are almost completely the responsibility of members of the pork industry. The First Amendment does not lie dormant merely because the government acts to consolidate and facilitate speech that is otherwise wholly private.

### 2. Compelled Speech

With its programs properly characterized as private speech, the constitutionality of the Pork Act turns on whether pork is more like mushrooms or more like peaches. *See* F.J. Dindinger, *Free Speech for Mushrooms but not Peaches: Economic Regulations after* United Foods, Inc., COLO. LAW. 61 (April 2002). In *United Foods*, the Supreme Court held that the Mushroom Act – which provided for mandatory assessments that were used primarily to fund the generic advertising of mushrooms – violated the First Amendment's prohibitions against compelled speech. *Id.* at 411. However, in *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997), the Supreme Court held that the Agricultural Marketing Agreement Act – which established mandatory assessments that funded a broad regulatory apparatus that included, as one of its many programs, promotional advertising of California tree fruit – did not constitute unlawful compelled speech.[2]

Because the Pork Act is nearly identical in purpose, structure, and implementation to the Mushroom Act, the Pork Act is unconstitutional under the analysis set forth in *United Foods*. The Pork Act mandates that:

(3) Nothing in this chapter may be construed to -
(A) permit or require the imposition of quality standards for pork or pork products;

---

[2] The federal courts have yet to weigh in on many other agriculture-promoting programs, including those touting "The Incredible, Edible Egg"; "Ah . . . the Power of Cheese"; and "The Touch ... the Feel of Cotton ... the Fabric of Our Lives." *See* Note, *The Constitution – It's What's for Dinner*, 2 WYO. L. REV. 617, 638 (2002). Earlier this year, however, the Eighth Circuit invalidated, as unconstitutional compelled speech, the mandatory assessment program bearing the slogan "Beef – It's what's for Dinner." *See Livestock Mktg. Ass'n v. United States Dep't of Agric.*, 335 F.3d 711 (8th Cir. 2003).

(B) provide for control of the production of pork or pork products; or
(C) otherwise limit the right of an individual pork producer to produce pork and pork products.

7 §4801(b)(3). This scheme is a far cry from that upheld in *Glickman*, which – in addition to funding a promotional campaign – provided for regulated price, output, and quality, and also authorized joint research and development projects, inspections, and even standardized packaging. *Glickman*, 521 U.S. at 461. With the express prohibition on this type of non-promotional regulation, the Pork Act serves but one purpose: promotion. This case is therefore governed by *United Foods*.

MPPA attempts to distinguish the Mushroom Act from the Pork Act, claiming that most of the funds collected by the former were used for generic advertising, whereas only 16 percent of the total expenses in the 2001 Budget for all the activities funded under the latter were used for generic, nationwide advertising. In fact, the record reflects that the majority of the Pork Act's funds support advertising and promotions. The 2001 Budget called for $29,388,491, or 51 percent of the total expenses, to be used under the category of "Demand Enhancement." *Id.* Expenditures in this area were budgeted as follows:

| | |
|---|---|
| Demand Enhancement Programming | $2,816,000 |
| Advertising | $8,825,000 |
| Merchandising | $5,400,000 |
| Foodservice | $3,697,000 |
| Pork Information Bureau | $2,800,000 |
| Foreign Market Development/World Trade | $5,850,491 |

The district court also found that Pork Act programs providing for "education" and "research" were designed to further the Act's promotional goals. *MPAA II*, 229 F. Supp. at 777. Thus, the use of the assessments to fund advertising under the Pork Act is prohibited by the First Amendment

because the expression that CFF and its members must support "is not germane to a purpose related to an association independent from the speech itself." *United Foods*, 533 U.S. at 415-16.

Finally, we find inapplicable to this case the relaxed scrutiny of commercial speech analysis provided for by *Central Hudson*, and relied upon by Appellants. The Pork Act does not directly limit the ability of pork producers to express a message; it compels them to express a message with which they do not agree. Even assuming that the advertising funded by the Act is indeed commercial speech, the more lenient standard of review applied to limits on commercial speech has never been applied to speech – commercial or otherwise – that is compelled. *See Glickman*, 521 U.S. at 474 n.18 (questioning whether "the *Central Hudson* test, which involved restrictions on commercial speech, should govern a case involving the compelled funding of speech"). It is one thing to force someone to close her mouth; it is quite another to force her to become a mouthpiece.

### 3. Remedy

Finally, we conclude that the district court properly invalidated the Pork Act in its entirety. Because the Act has no "severability clause" providing for the preservation of those statutory provisions that comply with the Constitution, we must invalidate the entire statute if the "balance of the legislation is incapable of functioning independently." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). The very basis for holding that the Act violates the First Amendment – that its assessment of fees to promote pork is the chief goal of the Act, which does not create a broader regulatory program – prevents us from preserving other parts of the statute. *See Livestock Mktg. Ass'n v. United States Dep't of Agric.*, 335 F.3d 711, 726 (8th Cir. 2003) ("[T]he fact that the 'principal object' of the Beef Act is the very part that makes it unconstitutional, (i.e., compelling funding of generic

advertising) [means that] no remaining aspects of the Act can survive."). It would be paradoxical to conclude simultaneously that Congress sought only to promote pork and that Congress still intended the incidental provisions of the Act to operate independently.

Nor does *United Foods* instruct otherwise. Appellant contends that: (1) this Court's decision in that case invalidated only part of the Mushroom Act; and (2) the Supreme Court affirmed the decision of this Court in its entirety. This argument misunderstands both decisions. The lone sentence in this Court's decision upon which Appellants rely – which states that "[t]he portions of the Mushroom Act of 1990 which authorize such coerced payments for advertising are likewise unconstitutional" – was part of the analysis that distinguished the Mushroom Act from the statute upheld in *Glickman*, and in its context is most fairly read only as a comparison of the two statutes. This reading is confirmed by the Supreme Court's discussion of the decision below, which states only that "the Sixth Circuit held this case is not controlled by *Glickman*." *United Foods*, 533 U.S. at 409. Even more illustrative is the Supreme Court's conclusion in *United Foods* that "[t]he only program the Government contends the compelled contributions serve is the very advertising scheme in question." *Id.* at 415. The decision to invalidate the advertising provisions of the Mushroom Act *by definition* resulted in the invalidation of the entire statute.

It would contort congressional intent if we were to take a statute that seeks entirely to promote a particular product and then strain to preserve the purportedly non-promotional provisions of that very statute. And the Supreme Court does not require that we do so. The district court was correct in striking down the entire Pork Act.

## _____III. CONCLUSION

For the reasons stated, we **AFFIRM** the grant of summary judgment by the district court.