**MICHIGAN PORK PRODUCERS, et al., Plaintiffs/Intervenors/Cross–Defendants,**

v.

**CAMPAIGN FOR FAMILY FARMS, et al., Defendants/Intervenors/Cross–Plaintiffs,**

v.

**Ann Veneman, Secretary of the United States Department of Agriculture, et al., Cross–Defendants.**

**Case No. 1:01–CV–34.**

United States District Court, W.D. Michigan, Southern Division.

Oct. 25, 2002.

Robert Charles Timmons, Troy W. Haney, John R. Kramer and Edward M. Mansfield, Grand Rapids, MI, for Plaintiffs/Intervenors/Cross–Defendants.

Susan E. Stokes, David R. Moeller and Christopher M. Bzdok, Traverse City, MI, for Defendants/Intervenors/Cross–Plaintiffs.

W. Francesca Ferguson, Thomas Millet and Carolyn McKee, Washington, DC, for Cross–Defendants.

### *OPINION*

ENSLEN, District Judge.

"[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." Thomas Jefferson, Virginia Act for Establishment of Religious Freedom (1786), codified at Va.Code Ann. § 57–1 (Miche 2002).

### *INTRODUCTION*

This matter is before the Court on Defendants/Interveners/Cross–Plaintiffs Campaign for Family Farms ("CFF") and its named members' (together "Cross–Plaintiffs") Motion for Summary Judgment and Motion to Dismiss.[1] It is also before the Court on the Motions for Summary Judgment filed by Plaintiffs Michigan Pork Producers *et al*[2] and Defendants Secretary of Agriculture Ann Veneman and Agriculture Administrator A.J. Yates ("Governmental Defendants"). Related to the above Motions for Summary Judgment are Motions to Strike filed by both Plaintiffs and Governmental Defendants (together "Cross–Defendants").

Ignoring preliminary questions for the minute, fundamentally this case asks the question of whether the system of mandated assessments for generic pork advertising created as a result of the Pork Production, Research and Consumer Education Act of 1985, 7 U.S.C. § 4801 *et seq.*, ("Pork Act"), *i.e.*, an assessment of 45 cents on each $100 of pork per hog sold, violates objecting producers' First Amendment rights of free speech and association.[3] The pole stars guiding this decision are the 2001 decision of the United States Supreme Court in *United States v. United Foods, Inc.*, 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) and its 1997 deci-

1. The named members are James Dale Joens, Richard Smith, Rhonda Perry and Lawrence Ginter collectively.

2. The other named Plaintiffs include the National Pork Producers Council, Pete Blauwikel, Bob Bloomer, High Lean Pork, Inc., California Pork Producers, Kentucky Pork Producers, Indiana Pork Producers, New York Pork Producers, and Ohio Pork Producers.

3. This is the current assessment rate under 7 C.F.R. § 1230.112. The Pork Act itself allows assessments of between 25 and 50 cents for $100 of pork sold as to each hog sold. 7 U.S.C. § 4809(b).

sion in *Glickman v. Wileman Brothers,* 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997). For the reasons which follow, the Court determines that the *United Foods* decision is the more pertinent precedent and that the Pork Act offends objecting producers' First Amendment rights of free speech and association.

***PROCEDURAL BACKGROUND***

This case began as a judicial challenge to a voluntary, "fairness" referendum of pork producers as to whether the Pork Order (the executive order authorizing the Pork Check-off Program ("Pork Program" or "Program") under the Pork Act) should continue. *See Michigan Pork Producers Association v. Campaign for Family Farms,* 174 F.Supp.2d 637 (W.D.Mich. 2001). The result of the previous, disputed "fairness" referendum announced on January 11, 2001, was that 15,951 producers disfavored the Program and 14,396 producers favored the Program. *Id.* at 639. Plaintiffs initially challenged both the counting of the votes and the legal basis for Program termination. Subsequent to the filing of the Complaint, the change in Presidential administrations brought a new Secretary of Agriculture, Ann Veneman, who settled with Plaintiffs by agreeing not to terminate the Program based on the referendum vote. *Id.* This settlement was subsequently upheld by the Court as within the discretion of the Secretary. *Id.* at 648.

Notwithstanding the determinations in the published decision, this lawsuit continued. Cross-Plaintiffs filed cross-claims against the Governmental Defendants and the Plaintiffs. The constitutional basis for the new cross-claims was the First Amendment protections for freedom of speech and association. The precedential basis for the cross-claims was the Supreme Court's decision in the *United Foods* case (as well as the decision below by the Sixth Circuit Court of Appeals, *United Foods, Inc. v. United States,* 197 F.3d 221 (6th Cir.1999), which the Supreme Court affirmed). The parties have now filed multiple dispositive motions as to such claims as well as Motions to Strike portions of the evidentiary materials. Given the abundance of briefing and the need for prompt resolution, the Court dispenses with oral argument as to the pending motions.

***FACTUAL RECORD***

CFF is an advocacy group composed of four sub-groups, which are also community and public interest advocacy groups. Those groups are: the Land Stewardship Project; the Illinois Stewardship Alliance; Iowa Citizens for Community Improvement; and the Missouri Rural Crisis Center. (Perry Exhibit 1 at 5–7; Perry Exhibit 11 at 6–7.) Each of these organizations are compromised of individual members and each include substantial numbers of hog farmers. (Schultz Exhibit 6 at 40–44; King Exhibit 2 at 68, 70 & 79; Stokes Exhibit 26 at 58–61; Stokes Exhibit 27 at 159–64; Perry Exhibit 11 at 6–7, 22–23.) In addition to these sub-groups, CFF has 540 individual members who are hog farmers. (Perry Exhibit 4 at 233–34.)

CFF's agricultural interests are to promote family farming as opposed to the vertical integration of agricultural production, *i.e.,* factory farms. Since 1998, CFF has pursued as a primary goal the termination of the Pork Program. CFF views the Pork Program as beneficial to factory farming but antithetical to the interests of its members, who are family farmers. (*See* Perry Exhibit 11 at 6–9; Perry Declaration at ¶¶ 4–5, 14 & 18.) Plaintiffs seek a declaration that the Pork Program is unconstitutional and an injunction preventing the operation of the Pork Program and the taking of mandatory assessments.

CFF's named members' particular objections are typical of CFF views. CFF

members disagree with the generic advertising of pork, *i.e.*, the "Pork, the Other White Meat" advertising program paid for by use of the mandatory fees. CFF members assert that they raise hogs (animals), not pork (processed meat), and the Program supports a commodity they do not sell.[4] (Cross-Plaintiffs Brief, Dkt. No. 162, at 10.) They believe that this Program benefits packers and retailers to their detriment. (*See* Stokes Exhibit 12 at 1, stating that hog farmers' percentage of the revenue for each dollar of pork sold declined from 1996 to 2001 from 42.5 percent to 30.1 percent.) Cross-Plaintiffs also assert that generic advertising fails to promote the unique qualities and attributes of hogs raised on family farms. (Perry Declaration at ¶¶ 6, 7; Perry Exhibit 4 at 41–44; Joens Declaration at ¶¶ 13–14; Smith Declaration at ¶ 13.) Presumably, if Cross-Plaintiffs had control of their own advertising dollars, they might spend it in very different ways from a generic campaign. For example, a campaign to sell family farm products and to discourage consumption of mass produced pork. Cross-Plaintiffs also assert that the generic advertising promotes "lean pork" and that they are opposed to the production of excessively lean pork because of the unhealthy and inhumane conditions which they believe are connected with its production. (Perry Declaration ¶¶ 6–7; Smith Declaration ¶ 13; Schultz Exhibit 6 at 60–61.) Additionally, some CFF members disagree with the generic advertising because they believe it misrepresents pork as a white meat and discourages the sale of bacon and ham. (Cross-Plaintiffs Brief, Dkt. No. 162, at 11.)

Additionally, the Pork Program supports some name brand advertising of large processors such as Hormel or Smithfield. CFF includes members such as Perry and Joens who have chosen to slaughter their own hogs in order to market hogs raised in non-factory conditions. These members strongly oppose name brand advertising of products sold by their competitors. (*Id.* at 11–12; Perry Declaration at ¶ 8; Schultz Exhibit 6 at 68.) Cross-Defendants have admitted that about $800,000 of funds are used in branded ads, but have further clarified that the branded ads assert generic messages (*i.e.*, "Pork, the Other White Meat"). (Hugh Dorminy Declaration at ¶¶ 26–27; Plaintiffs' Opposition, Dkt. No. 198, at 16.)

Pork Program funds also support certain "education" programs. Cross-Plaintiffs view these "education" programs as misinformation programs in that they propagate the view that large commercial farming operations are humane. Defendant Joens has stated:

> I raise my hogs using humane methods; they are not confined in pens their entire lives, as they are in many factory hog farms. I object to my checkoff dollars being used to publish information that helps cover up the abuses of those large corporate confinement facilities.

(Joens Declaration at ¶ 7.) Defendant Smith has similarly stated:

> These programs are for people that work in the corporate hog factories that have never seen a hog before they went to work for a huge conglomerate. I object because this is independent producer money going to a program that is focused on corporate hog factories and not the independent producers who believe in animal husbandry and who have been handling hogs humanely for years....

(Smith Declaration ¶ 10.) Some CFF members also object to funding of "edu-

4. The implication being that the Pork Program supports pork processors whose advertising and financial interests are diverse from family hog farmers.

cation" because they adamantly oppose this method of raising livestock. (Perry Declaration ¶¶ 7–9, 11–13 & 15.)

Another portion of the allocations are dedicated to research, especially research as to the use of antibiotics. The Pork Board has apparently funded expenditures called "Antimicrobial Resistance and Alternatives Research." Some CFF members take issue with the research and believe that positions taken by the Pork Board as to antibiotics jeopardize the safe consumption of pork. (Perry Declaration at ¶ 15; Smith Declaration at ¶ 10; Schultz Declaration at ¶ 8.) This research is also apparently related to the "education" goals of the Pork Board—*i.e.*, communications to producers to convince them to adopt practices favored by the Pork Board. For 2002, $454,000 of the Pork Program budget was allocated to education. (Perry Exhibit 3.)

CFF members also object to forced association with both the Pork Board, the National Producers Council (the Iowan not-for-profit corporation that until recently has done advertising for the Pork Board) and the state pork associations who are allocated 18 percent of the assessments for their own advertising. CFF members are "forced" to associate with the Pork Board in that they are required to obtain a "Pork Quality Assurance" certification to sells hogs, which certification bears the name of the National Pork Board. (Smith Declaration at ¶ 7; Joens Declaration at ¶ 12; Smith Exhibit 2; Joens Exhibit 1.) Until 2002, the card also associated producers with the Producers Council. (Smith Exhibit 2.) State pork associations apparently are involved in a variety of marketing activities and lobbying efforts. Cross–Plaintiffs' statements imply that they have strong philosophical and commercial objections to these efforts, similar to their objections to generic Pork Act advertising.

As is clear from the Declarations and Exhibits filed by Cross–Plaintiffs, CFF and its members principally oppose the Pork Program for a variety of reasons. Though those reasons are not always consistent nor persuasive, they are, nevertheless, Cross–Plaintiffs' sincere and strongly-held views.

On the other side of the ledger, Plaintiffs and Government Defendants have made clear the economy value of the Pork Program to the agricultural economy. According to an impressive expert study of a team of researchers at Texas A & M University's Agriculture Department, the Pork Program has a very positive economic effect on pork producers. (*See* Deposition of Oral Capps, Ph.D. and Deposition Exhibits 110 & 112.) This study was commissioned in 1998, significantly before the filing of this suit, to justify the original Program. One of the conclusions of the study is that each dollar of assessments generates $4.79 for pork producers. (Capps' Deposition Exhibit 112 at ¶ 3.) Further, it is estimated that "demand enhancement" (principally advertising) generates $15.26 per dollar invested. (*Id.* at ¶ 4–5.) To put it somewhat differently, on the sale of the typical hog, the producer earns an additional $1.17 because of the effect of advertising and marketing on demand. (*Id.*) The study also indicated that a mandatory program was necessary because a system of voluntary payments would suffer from "free riders"—*i.e.*, producers who did not want to contribute, but who wanted to benefit from a program. (*Id.* at ¶ 2.) Also, a voluntary program would not generate sufficient revenue. (*Id.*) Prior to any mandatory program, a voluntary program had operated and generated only $9 million dollars of assessments per year. (Plaintiffs' Reply, Dkt. No. 215, at 16, citing S. Rep. 99–145.)

CFF's economic expert, Dr. Siegert, disagreed with Dr. Capps' conclusions to a

limited degree. Dr. Siegert suggested that a different discount rate should be used to assess the economic effects and that, applying the different discount rate, the use of assessments generates only $2.63 for pork producers per dollar of assessments. Dr. Siegert also expressed a criticism of the report because he felt that there were some "free riders" of the Pork Program—*i.e.*, that the Program benefits wholesalers and processors without making them contribute to the cost. However, Dr. Siegert essentially admitted that due to the complexity of "tax incidence" it was difficult to assess the accuracy of this criticism. (Siegert Deposition at 102–104.)

Notwithstanding such data, CFF conducted its own study of 500 hog farmers in September 2001. (Stokes Supplemental Declaration Exhibit 44.) Fifty-seven percent of those surveyed believed that large producers received the greatest benefits from the Program; only 38 percent of those surveyed believed that the Program benefitted all producers equally. (*Id.*) These survey results are consistent with the referendum vote announced by Secretary Glickman in January 2001. The referendum vote itself evidences such widespread discontent with the Pork Program that it is bound to include many individuals who, like Cross-Plaintiffs, strongly disagree with Pork Program messages, and many others who simply believe that they can choose more economically effective uses of the funds assessed than can the functionaries of the Department of Agriculture.

***STANDARD FOR SUMMARY JUDGMENT***

As to the motions now before the Court, each of these motions turns on the standards set forth in Federal Rule of Civil Procedure 56.[5] Under Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a trier of fact could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, after adequate time for discovery on material matters, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions. *Adams v. Metiva,* 31 F.3d 375, 382 (6th Cir.1994). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548 (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Ra-*

5. One of the motions requested dismissal under Rule 12 as opposed to summary judgment. Nevertheless, because the Motion to Dismiss raised matters outside the pleadings, it is properly analyzed under Rule 56. *See* Rule 12(b). Furthermore, the Motions to Strike raised issues pertinent to the Rule 56(e) requirements, which are discussed herein.

*dio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis,* 57 F.3d 476, 478 (6th Cir.1995) (quoting Federal Rule of Civil Procedure 56(c)). Moreover, affidavits must meet certain requirements:

> [A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed.R.Civ.P. 56(e). The Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir.1993). Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *id.,* unsworn statements, *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–969 (6th Cir.1991), inadmissible expert testimony, *North American Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1280 (6th Cir.1997), or hearsay evidence, *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996); *Wiley v. United States,* 20 F.3d 222, 225–226 (6th Cir.1994).

***LEGAL ANALYSIS***

***Motions to Strike***

Cross–Defendants have filed Motions to Strike portions of the testimony of CFF's members. This testimony is obviously important since it provides a basis for standing and a basis for CFF's claims that its members oppose the use of Pork Program funds.

Governmental Defendants urge that CFF's members' objections to the Program are unreliable in that the members did not disclose the nature of their objections to particular Program expenditures in depositions predating their declarations. While it is true that it is improper for a witness to contradict deposition testimony by an affidavit or declaration for the purpose of avoiding summary judgment, *see Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 460 (6th Cir.1986), this rule does not apply to a witness who is simply clarifying or expanding upon previous testimony. *Messick v. Horizon Industries, Inc.,* 62 F.3d 1227, 1231 (9th Cir.1995). In this case, the challenge is unpersuasive since the Court does not recognize any "inconsistency." CFF's members are hog farmers. They have evidently objected to the taking and use of Pork Program funds for some time. Nevertheless, those members continue to investigate the objects of the Program and continue to find different aspects of the Program which are disagreeable to them. The fact that after their depositions they could articulate more and specific reasons for disagreeing with particular Pork Program messages (while in the process of continual research) is not a reason to pretend that they do not have serious objections to Pork Act spending. Rather, it seems to be substantial proof that CFF members are thinking persons open to continually analyzing their views and that in the course of analyzing their views CFF members have found additional reasons for objecting to Pork Act spending. None of these arguments gives the Court any pause in concluding that CFF's members have sincerely held and strong beliefs which cause them revulsion to Pork Act speech and association.

As for Plaintiffs' Motion to Strike, the Motion provides a specific sentence by sentence review of each of the declarations. The Motion objects to many exhibits based

on lack of foundation, which is a poor objection in the context of Rule 56(e). Rule 56(e) is foremost a "personal knowledge" requirement, which is unrelated to the traditional evidentiary objection for lack of foundation. No persuasive legal authority is cited for this argument.

Plaintiffs' Motion does tender objections to many exhibits based on lack of personal knowledge and hearsay. While these are valid objections, legally speaking, they are inappropriate in this instance. The statement of CFF members' objections (and the reasons for those objections) was not intended to prove the truth of their statements about the state of the agricultural economy and pork promotions as a whole. It was only offered to prove that they have sincerely-held beliefs at odds with the use of Pork Act funds and particular Pork Program expenditures. Thus, hearsay and personal knowledge objections are not appropriate as to such testimony. Furthermore, the objections to the testimony (to the extent the testimony was intended to establish facts about the agricultural economy outside the speaker's direct knowledge) are generally not material. The point of this legal analysis is not to decide what is the best form of pork advertising, but rather to determine whether named Plaintiffs have strongly held beliefs at odds with the use of Pork Act assessments to fund generic advertising and other public expression contemplated by the Act.[6] Further, it makes little sense to analyze Plaintiffs' Declarations to discover how the Pork Program operates since the operation of the Pork Program is a matter which is not in significant question given the statutory, administrative and public record of its operations. Therefore, both Motions to Strike will be denied.[7]

***Standing and Capacity***

Cross–Defendants argue that CFF and its named members lack standing and that CFF lacks capacity to sue. Article III of the United States Constitution, of course, limits the exercise of judicial power to actual cases and controversies. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The constitutional requirements for standing are also supplemented by the "prudential" requirements for standing—which ask whether prudential concerns should limit a federal court's exercise of jurisdiction. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Prudential considerations include whether a party is asserting a generalized grievance that is not peculiar to the party; whether the party is asserting the rights of third parties; and whether the injury alleged is outside of the "zone of interest" protected by the law creating the cause of action. *Cannon v. J.C. Bradford & Co.,* 277 F.3d 838, 853 (6th Cir.2002). Rule 17 also imposes a "real party"/capacity requirement on organizational parties, which is related to the standing requirement. The burden of proof and persuasion as to standing and capacity is upon Cross–Plaintiffs. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

To begin with the capacity question, Rule 17(a) requires that actions be prosecuted and defended by a "real party in interest." Rule 17(c) allows suit by an unincorporated association to the same extent as recognized by the laws of the forum state. Rule 17 is not intended to limit capacity beyond any state law controlling association requirements nor beyond the usual rules for standing. In this case, based on the argument, Cross–Defendants'

6. This is not to say that the Court has disregarded statements by CFF declarants which were within their personal knowledge as hog producers.

7. The Court also adopts by reference Cross–Plaintiffs' responses to specific objections, contained at pages 7–14 of Cross–Plaintiffs' Opposition, Dkt. No. 219.

concerns as to CFF appear for the most part to relate to standing and not to any particular requirements of state law. Governmental Defendants have argued that CFF lacks capacity because they are a "campaign" and not an "association." However, this argument is not made in the context of any state law requirements for capacity. It is made without reference to any controlling legal definitions distinguishing a "campaign" and an "unincorporated association." It is also made in the face of precedent which supports a view that association capacity be freely granted to associations meeting standing requirements.

Cross-Defendants' capacity argument is based on such cases as *Brown v. Fifth Judicial District Drug Task Force,* 255 F.3d 475, 476 (8th Cir.2001), a case holding that a drug task force lacks standing to assert rights on behalf of the constituent law enforcement entities, and *Roby v. Corp. of Lloyd's,* 796 F.Supp. 103, 109–10 (S.D.N.Y.1992), rejecting capacity of a business syndicate. These precedents are inapposite. As to the *Brown* case, an important and much different interest is served in the context of criminal tasks forces by limiting capacity to the constituent recognized legal entities forming the task force. This assures voters that the entities represented before Court are legally recognized and politically accountable to voters for the litigation choices made (as opposed to task force members who may have no allegiance to the voters of any given entity). Likewise, as to the *Roby* case, different interests are at play. A business syndicate is not a recognized legal entity and should not advocate financial interests contrary to those of syndicate members who are recognized legal entities. These precedents simply do not apply to unincorporated associations engaged in political and social advocacy, which often are fluid, created for the purpose of advocacy upon a single issue, and lacking in organization detail.[8]

Standing requirements for unincorporated associations were explained by the Supreme Court in its decision in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). According to *Hunt,* the requirements for an unincorporated association to have standing to sue are: (1) the individual organization members would have standing in their own rights; (2) the interests sought to be protected are germane to the organization's purpose; and (3) neither the claims asserted nor the relief requested require participation by individual members. *Id.*

■ In this case, there is sworn unrebutted testimony that CFF includes 540 members, who oppose mandatory assessments on ongoing hog sales. (Schultz Exhibit 6 at 40–44; King Exhibit 2 at 68, 70, 76 & 79; Stokes Exhibit 26 at 58–61; Stokes Exhibit 27 at 159–64; Perry Exhibit 11 at 6–7, 22–23.) According to CFF's named members, these unnamed members are or were hog farmers subject to the assessments. (Perry Exhibit 4 at 233–34.) These individual members have been polled and contacted by telephone surveys and mailings to ascertain their opposition to the use of Pork Program funds. (Perry Exhibit 11 at 19–23.) This suit was brought only after CFF had received objections to the Pork Program from hundreds of its members. (Schultz Declaration

8. Governmental Defendants have also cited the cases of *McKinney v. United States Dept. of Treasury,* 799 F.2d 1544, 1553 (Fed.Cir.1986) and *Minnesota Public Interest Research Group v. Selective Service System,* 557 F.Supp. 925 (D.Minn.1983). These cases are about standing under the *Hunt* factors; they do not establish a separate "capacity" test for unincorporated associations.

at 4; King Declaration at 4.) This evidence and the lack of any real opposition to it establishes as a matter of law that the individual organization members would have standing to sue in their own right.

One point related to the first prong of the *Hunt* test is the extent of discovery as to CFF's membership. CFF has declined discovery requests for its membership list. It has done so based on federal case law which recognizes a right of an association to not disclose its membership because such disclosure is likely to erode membership. As was recognized by the Supreme Court in *Bates v. City of Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute an effective ... restraint on freedom of association." *See also Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 498, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Familias Unidas v. Briscoe,* 544 F.2d 182, 192 (5th Cir.1976) (holding that membership information could be compelled through a discovery request); *cf. Marshall v. Bramer,* 828 F.2d 355, 359–60 (6th Cir.1987) (permitting sealed discovery as to membership of violent, white supremacist group for the purpose of prosecution of an arson suit).[9]

█ While the Court agrees in principle with Cross–Defendants that it must balance the need for discovery versus the First Amendment interests protected by non-disclosure, in this case the balance falls decidedly on the side of non-disclosure. The members are all persons subject to federal regulation by the Department of Agriculture. Whether true or not, those members are likely to have substantial fears that disclosure of their names to the Department of Agriculture could result in their disparate treatment. Under this scenario, disclosures of those names would be corrosive to the individuals' rights of association so as to be forbidden by the First Amendment and by prudential concerns. It would make little sense to require such discovery in the context of a First Amendment speech and association challenge. If this were done, the working of the discovery mechanisms would impose an injury on Cross–Plaintiffs tantamount to the rights sought to be vindicated in the suit.

While it is also true that Governmental Defendants have cited cases for the proposition that associational standing should not be granted when opponents have not had a fair opportunity to discover facts concerning the standing of individual members, *see, e.g., American Immigration Lawyers Ass'n v. Reno,* 18 F.Supp.2d 38, 51 (D.D.C.1998), the focus of those cases is whether enough information was supplied as to *one or more* identified members so as to give the district court a proper basis for finding of standing. In this case, Cross–Plaintiffs have identified four individual members who have been subjected to grueling discovery and as to whom a finding of standing is clearly required. The law does not require that CFF impose these burdens on all of its membership as a condition for suit.

It further bears mention that this discovery issue was not properly raised in the context of these motions. If Cross–Defendants were owed discovery, the proper course was to, long ago, file a motion to compel discovery under Rule 37. If they

9. The *Marshall* decision is distinguishable in that in such suit there was a much stronger need for the discovery; there was a lesser First Amendment interest at stake in that the defendants were engaged in non-protected and criminal activities in addition to protected activities; and the option of sealed discovery was a workable solution.

objected to a discovery order by a magistrate judge, the proper course was to appeal it as clearly erroneous under Rule 72(a).[10] In the absence of any timely pursuit of the information through a proper procedural mechanism, the Court must view such complaints for what they are—chaff fit for the furnace.

In terms of the other prongs of the *Hunt* test, they too are satisfied. The interests sought to be protected in this suit (speech and association interests of family farmers) are germane to the interests of CFF-which is an acknowledged umbrella group for family farm organizations and individual farmers which has had since 1998 an objective to challenge the Pork Program. Also, individual members need not participate to obtain the very general relief sought—*i.e.*, a declaration of unconstitutionality and an injunction against future operation of the Program. Therefore, it is clear that CFF has capacity to sue. Since CFF has capacity to sue, the greatest part to the challenge to standing (against CFF) is not well taken.

Another general argument made by Plaintiffs is that some or all of the Cross–Plaintiffs lack standing because they receive federal producer subsidies as hog producers which are greater in value than the amount of assessments paid. While the premise may be true, it is irrelevant. Not a single case has been cited for the proposition that a producer does not have standing to object to mandatory assessments because of a separate program of farm subsidies. The lack of precedent is telling in that the end of this argument is truly pernicious. This argument would deprive a litigant of standing and would deprive federal courts of inquiry as to all kinds of governmental abuses of the First Amendment whenever there was a separate and unrelated system of subsidies. If it was not clear to Plaintiffs when they wrote those words, they should understand now that this Court will not countenance any argument that the government has "bought" a system of unconstitutional treatment through the creation of a separate and unrelated system of subsidies.

As for the four individual members of CFF, Cross–Defendants have raised some questions as to the size of their hog production, the amount of their assessments paid, and the likelihood that they will pay future assessments. For instance, Lawrence Ginter, Jr. retired from hog sales in 2000, though he has "left the door open" as to whether he will sell hogs in the future. (Stokes Exhibit 51 at 44–48.) With respect to Ginter, his claims are not moot since they are "capable of repetition, but evading review." *Corrigan v. City of Newaygo,* 55 F.3d 1211, 1213 (6th Cir.1995).[11] As for the questions raised by Cross–Defendants regarding the other named members (with the exception of Richard Smith, who they concede has standing), a thorough analysis of the record reveals that these are inconsequential concerns in that

10. It is also possible to contest this issue through the filing of a persuasive Rule 56(f) affidavit. It does not appear that this procedure was followed in this case and, even if it had been made, it was untimely in light of a failure to timely pursue the discovery through motion practice.

11. Even if the claims of Ginter were moot, the Court would still properly rely upon his objections to the particular Pork Program spending because his views are representational of at least some of CFF's membership, given the uncontested evidence of CFF's membership surveys. Furthermore, much of the argument about standing in this case is unnecessary. As stated by Cross–Plaintiffs, the *United Foods* case struck down the Mushroom Act based on the standing of a single producer. (Reply Memorandum, Dkt. No. 228, at 3.) In this case, Cross–Defendants admit standing as to Richard Smith and Smith's standing, by itself, is sufficient to drive the litigation of the constitutional issues mentioned here.

the record evidence certainly supports that James Joens and Rhonda Perry have had some financial interests in hogs sold subject to assessment and continue to have some financial interests in hogs which will be sold subject to the assessment. (*See* Cross–Plaintiffs' Opposition to Plaintiffs' Motion for Summary Judgment on First Amendment Claims, at 27–28 and documents cited therein.) It is not required for standing that they have large swine herds nor that their hog ownership encompass any particular form of ownership (e.g., individual ownership as opposed to joint ownership). Therefore, the Court determines as a matter of law that Cross–Plaintiffs have both capacity and standing to assert their claims.

***Unclean Hands***

Cross–Defendants have urged that Cross–Plaintiffs should be prohibited from pressing its claims for equitable relief (declaratory judgment and injunction) due to the doctrine of unclean hands. Cross–Plaintiffs, though, have moved to dismiss this defense as a matter of law. This doctrine provides, generally, that a party seeking equity cannot obtain relief when the party is guilty of unconscionable conduct directly related to the matter of litigation. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir.1995); *In re Ben Jean Prevot*, 59 F.3d 556, 561 (6th Cir.1995). In this case, the inequitable conduct is only charged against one CFF member, Rhonda Perry. It is claimed that she improperly operated Patchwork Farms as a for-profit business and advocacy organization even though it was registered as a non-profit organization in violation of 26 U.S.C. § 501(c)(3). It is argued by Cross–Defendants that this violation is related because Patchwork Farms purchased a large numbers of hogs from Rhonda Perry's husband.

Even assuming that there was some proof of a section 501(c)(3) violation, which the Court cannot find on this record, there is nothing in the record which directly connects the violation by the not-for-profit corporation to the subject matter of this suit. Furthermore, even if some of Rhonda Perry's hog sales which were subject to assessment were made to the not-for-profit corporation, it remains true that many other sales were made to other buyers. Moreover, even assuming a violation, the worst that can be said is that the not-for-profit corporation received tax subsidies to which it was not entitled. This is hardly proof that Rhonda Perry is guilty of the kind of grossly unconscionable misconduct which is usually the source of an unclean hands defense. *See Performance Unlimited, supra.* It is also hardly proof that the misconduct was directly related to the First Amendment challenges in this case. *See Shondel v. McDermott*, 775 F.2d 859, 869 (7th Cir.1985) (holding that denial of preliminary injunction was inappropriate based on unrelated Hatch Act violation).

Cross–Defendants should also remember that the purpose of equity is to do equity. It would hardly be equitable to foreclose a constitutional argument regarding compelled association and speech because of a past receipt of a tax subsidy by a separate not-for-profit corporation. It also goes without saying that the attempt by Cross–Defendants to apply this argument to not only Perry but to all Cross–Plaintiffs would be a true perversion of equity and an affront to public policy. *See Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 138, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (rejecting unclean hands defense in context of Sherman and Clayton Act cases). As Judge Posner stated in *Shondel*, 775 F.2d at 869, "[e]quitable defenses such as unclean hands may also have more limited play in free speech cases than elsewhere. There is an analogy to antitrust law, where the Supreme Court has forbidden the rec-

ognition of a similar defense—*in pari delicto* (equally at fault)-in order to encourage antitrust enforcement." *See also Mitchell Brothers Film Group v. Cinema Adult Theater,* 604 F.2d 852, 861 (5th Cir. 1979). The interests at stake here are simply too weighty to be driven upon the shoals of failed litigation because of the alleged tax cheating of a single litigant.[12] As such, the Court determines as a matter of law that Cross–Plaintiffs are entitled to summary judgment on the defense of unclean hands.

***Governmental Speech***

■ Cross–Defendants argue that a First Amendment violation cannot be established on the present record because the speech resulting from the payment of assessments is "governmental speech." This defense is commonly applied in cases before this Court involving individuals who object to particular governmental messages, such as libertarians who oppose government funded anti-drug ads or pacifists who oppose army recruitment. As the Supreme Court has said,

> If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed.

*Keller v. State of Bar of California,* 496 U.S. 1, 12–13, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990).

In addition to these general principles, Cross–Defendants have supported their argument by reference to cases which, generally speaking, stand for the propositions that the government may tax and assess for the purpose of governmental speech, that the government may employ private actors to perform its speech, and that the speech need not be agreeable to those taxed or assessed. (*See, e.g.,* Plaintiffs' Brief in Opposition, at 3–5 and authorities cited therein.) Adding to the force of these arguments is the fact that the Supreme Court failed to address a government speech defense in the *United Foods* case because it had not been briefed or argued by the parties before the Sixth Circuit. *United Foods,* 533 U.S. at 415, 121 S.Ct. 2334. Although the Supreme Court did not address the issue in *United Foods,* it did refer to its prior decision in *Lebron v. National Railroad Passenger Corp.,* 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). In *Lebron,* the Supreme Court determined that Amtrack was a government entity for the purpose of determining whether it could limit speech in its leased facilities. To quote the Court:

> "We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment."

*Lebron,* 513 U.S. at 400, 115 S.Ct. 961.

Review of the organizational structure behind Pork Act advertising evidences a complex structure with extensive government oversight. The National Pork Board is a 15 member Board appointed by the Secretary of Agriculture. 7 U.S.C. § 4808(a). The Act intended that the Pork Board employ private contractors for the purpose of carrying out Pork Act activities. However, the Act provided that, during an interim period, assessment funds would be supplied to the National Pork Producers

12. By Cross–Plaintiffs' calculations, these issues will affect more than 80,000 hog farmers. (Cross–Plaintiffs' Motion to Dismiss, at 11.) They also evidently affect consumers, processors, retailers and countless workers.

Council (an Iowan not-for-profit corporation) to carry out the Act. *See* 7 U.S.C. § 4809. Since its creation, the National Pork Producers Council was the primary contractor for the Pork Board until July 1, 2001. (Stokes Declaration, Exhibit 2.) The Council's removal from that position resulted from the previous parties' February 28, 2001 settlement, which continued the Pork Program with modifications. Prior to the settlement, the previous parties were aware of a survey by the Office of Inspector General for the Department of Agriculture which criticized the extent to which the Pork Board had delegated authority to the Producers Council. (Plaintiffs' Motion, Dkt. No. 182, Appendix 14; Carpenter Deposition, Exhibit 51.) While the Producers Council is no longer the primary contractor, many of the same personnel who worked for the Producers Council still perform the Pork Act functions previously performed by the Producers Council. (Stokes Exhibit 5 at 6; Stokes Exhibit 16 at 131–41, 146–51.) Prior to 2002, the majority of Pork Act advertising was identified as from "America's Pork Producers," in reference to the Producers Council. (Hemmelman Reply Declaration at ¶ 3.)

Under the Pork Act, the Pork Board's planning and operations are to be overseen and approved by the Secretary of Agriculture. 7 U.S.C. § 4808(b)(1). The Secretary also has administrative authority to fire Board members when continued service would be "detrimental" to the purposes of the Pork Act. 7 C.F.R. § 1230.55. Furthermore, the Internal Revenue Service has determined to treat the Pork Board as a governmental entity for tax purposes. (*See* Plaintiffs' Motion, Dkt. No. 182, Appendix 27.) It is also noteworthy that Pork Board members are selected on a representational basis from nominees made by the National Pork Producers Delegate Body. 7 U.S.C. §§ 4806(g) and 4808(a). The Delegate Body is a larger

congress of pork producers which serves to recommend assessment rates and determine the percentage of overall assessments which are designated for use by state associations. 7 U.S.C. § 4806(h). The Delegate Body is nominated and elected within each state's producer association. 7 U.S.C. § 4807. There are currently 44 state pork associations, six of whom are parties to this suit. (Stokes Declaration ¶ 6; Stokes Exhibits 4 & 16.) The Department of Agriculture has no authority to appoint or approve the leadership of the state associations. 7 U.S.C. § 4802(16); 7 C.F.R. § 1230.25.

As stated earlier, the current assessment is 45 cents per $100 in market value for each hog sold. 7 C.F.R. § 1230.112. These assessments fund the Pork Board, whose budget was $57.5 million in 2001 (with a $4.5 million deficit). (Stokes Exhibit 1, NPPC 374.) Of this budget, $29.4 million was used for "demand enhancement." (*Id.*) Demand enhancement includes advertising, marketing and merchandising. (*Id.*, NPPC 274–378.) For 2001, state pork associations were allotted $10.4 million, or 18 percent of assessment funds. (*Id.*, NPPC 374.)

Consistent with the Pork Act, the Department of Agriculture regularly reviews the advertising and other project budgets of the Pork Board. (Carpenter Deposition at 33, 60–61; Dorminy Deposition at 101.) The Department also reviews the budgets of state associations. (Carpenter Deposition at 139–140; Dorminy Deposition at 60–61.) As part of this review, the Department may request modification of budgets or repayment of disallowed items. (Carpenter Deposition at 106–112.)

Similarly, the Department reviews each Pork Act advertisement before airing. (Carpenter Deposition at 173, 182.) This review is a general review to ensure that the advertisement is factual, is not dispar-

aging of other commodities, and is consistent with the purposes of the Pork Act. (*Id.*) A similar review is done by the Department as to the advertisements of the state pork associations. (*Id.* at 148.) This kind of review results in amendments of only approximately four percent of the ads shown to the Department. (Hemmelman Reply Declaration at ¶ 3.)

While the Supreme Court did not address the governmental speech question in *United Foods,* this question has been addressed by federal courts in contexts very similar to the present one. In particular, the Third Circuit addressed this issue in the case of *United States v. Frame,* 885 F.2d 1119, 1132 (3rd Cir.1989). The *Frame* decision addressed the Beef Promotion and Research Act, 7 C.F.R. §§ 2901–11, which contained essentially identical mechanisms to those in the Pork Act for the funding and promotion of generic advertising to sell beef. The Third Circuit analyzed the issues in detail and specifically with reference to the Supreme Court's decisions in *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) and *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). *Abood* upheld a First Amendment challenge to the use of union dues, by a public school system, to finance political speech. *Wooley* upheld a First Amendment challenge to a legal requirement that a state's citizen display an offensive state moto, "Live Free or Die." The *Frame* Court's analyzed the government speech issue as follows:

> The district court and the government have set forth sound reasons for concluding that the expressive activities financed by the Beef Promotion Act constitute "government speech." The Cattlemen's Board and the Operating Committee, the argument goes, are merely instrumentalities created to enable the Secretary of Agriculture to communicate his message that beef is good. As we have previously noted, the connection between these entities and the Secretary is a close one. The Board and Committee members serve at the pleasure of the Secretary of Agriculture: Cattlemen's Board members are appointed by the Secretary, 7 U.S.C. § 2904(1); 7 C.F.R. § 1260.141(b), while members of both the Board and the Operating Committee may be removed "if the Secretary determines that the person's continued service would be detrimental to the purposes of the Act," 7 C.F.R. § 1260.212. Moreover, the Secretary makes the final decisions on all projects funded under the Act. All budgets, plans or projects approved by the Board become effective only upon final approval by the Secretary, 7 U.S.C. § 2904(4)(C), and no contracts for the implementation of any plans may be entered into without the Secretary's approval, 7 U.S.C. §§ 2904(6)(A) & (B); 7 C.F.R. §§ 1260.150(f) & (g), 1260.168(e) & (f). Thus, when the Board or Committee "speaks," they do so on behalf of the Secretary of Agriculture and the government of the United States.
>
> Nevertheless, though we find the issue a close one, the underlying rationale of the right to be free from compelled speech or association leads us to conclude that the compelled expressive activities mandated by the Beef Promotion Act are not properly characterized as "government speech." Justice Powell's *Abood* concurrence sought to ensure that "a local school board need not demonstrate a compelling state interest every time it spends a taxpayer's money in ways the taxpayer finds abhorrent." 431 U.S. at 259 n. 13, 97 S.Ct. 1782.... This attempt to cabin the *Abood* decision echoed prior sentiments that recognition of a broad right against compelled association and belief might obstruct normal

governmental functions. In *Wooley v. Maynard*, for example, the Court determined that coerced bearing of the state slogan on one's car violated freedom of belief, but apparently acquiesced to the dissent's observation that the state was free to tax all citizens for erection and maintenance of billboards bearing state motto "Live Free or Die," *see id.*, 430 U.S. at 721, 97 S.Ct. 1428 ... (Rehnquist, J., dissenting)....

These situations, we believe, are distinguishable from the case now before us. Both the right to be free from compelled expressive association and the right to be free from compelled affirmation of belief presuppose a coerced nexus between the individual and the specific expressive activity. When the government allocates money from the general tax fund to controversial projects or expressive activities, the nexus between the message and the individual is attenuated. *See Wooley v. Maynard*, 430 U.S. at 721, 97 S.Ct. 1428 ... (Rehnquist, J., dissenting). In contrast, where the government requires a publicly identified group to contribute to a fund earmarked for the dissemination of a particular message associated with that group, the government has directly focused its coercive power for expressive purposes.... This sort of funding scheme, with its close nexus between the individual and the message funded, more closely resembles the *Abood* situation, where the unions, as exclusive bargaining agents, served as the locutors for a distinguishable segment of the population, *i.e.*, the employees, or the *Wooley* case, where the state "require[d] an individual to participate in the dissemination of an ideological message ...," *Wooley*, 430 U.S. at 712–13, 97 S.Ct. at 1434, ... regardless of whether state-issued license plates constituted "government speech."

Furthermore, Justice Powell's justification for distinguishing compelled support of government from support of a private association does not fit comfortably with a "self-help" measure like the Beef Promotion Act. According to Justice Powell, the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests. 431 U.S. at 259 n. 13, 97 S.Ct. at 1811–12 n. 13. The Cattlemen's Board seems to be an entity "representative of one segment of the population, with certain common interests." Members of the Cattlemen's Board and the Operating Committee, though appointed by the Secretary, are not government officials, but rather, individuals from the private sector. The pool of nominees from which the Secretary selects Board members, moreover, are determined by private beef industry organizations from the various states. Furthermore, the State organizations eligible to participate in Board nominations are those that "have a history of stability and permanency," and whose "primary or overriding purpose is to promote the economic welfare of cattle producers." 7 U.S.C. § 2905(b)(3) & (4). Therefore, we believe that although the Secretary's extensive supervision passes muster under the non-delegation doctrine, it does not transform this self-help program for the beef industry into "government speech."

*Frame*, 885 F.2d at 1132–33.

Another federal court which has recently followed the reasoning in *Frame* is the District of South Dakota in its decision of *Livestock Marketing Assoc. v. United States Dept. of Agriculture*, 207 F.Supp.2d

992 (D.S.D.2002.) Whereas the *Frame* court ultimately upheld the Beef Act speech as compelled, but non-ideological speech, the *Livestock Marketing* case enjoined assessments under the Beef Act due to the logic of the intervening *United Foods* decision. The Livestock Marketing case also commented,

> Common sense tells us that the government is not "speaking" in encouraging consumers to eat beef. After all, is the "government message" therefore that consumers should eat no other product or at least reduce the consumption of other products such as pork, chicken, fish, or soy meal? The answer is obvious.

*Id.* at 1006. While the Eighth Circuit Court of Appeals has granted a stay of the *Livestock Marketing* decision, the stay itself does not provide much guidance. The Eighth Circuit's Order granting the stay was silent as to the merits of the controversy and should only be interpreted as staying the decision to maintain the status quo pending decision and protect the Eighth Circuit's jurisdiction. *See Livestock Marketing,* Appeal No. 02–2769, Order of July 10, 2002 (8th Cir. July 10, 2002) (included as Moeller Exhibit No. 59).

This Court concurs with the *Frame* and *Livestock Marketing* decisions. What is present here is a self-help program for pork producers. Though the Secretary is integrally involved with the workings of the Pork Board, this involvement does not translate the advertising and marketing in question into "government speech" as that term has been interpreted by the federal courts. You cannot make a silk purse from a sow's ear. This defense fails as a matter of law.

***First Amendment Speech and Association***

█ Before deciding the question of whether either of the parties is entitled to summary judgment on the First Amendment Speech and Association Claims, the Court must set forth the backdrop of precedent created by the Supreme Court's *United Foods* and *Glickman* decisions. These precedents are such that once their applicability is decided, conclusions of constitutionality or unconstitutionality are but a stone's throw away.

In *United Foods,* the Supreme Court tackled the constitutionality of the Mushroom Promotion, Research, and Consumer Information Act of 1990, 7 U.S.C. § 6101 *et seq.,* which was similar in its mechanisms and purpose—*i.e.,* the promotion of mushroom sales by generic mushroom advertising through an industry self-help program. In *United Foods,* the Supreme Court indicated that it was not addressing the question of whether the "commercial speech" analysis under *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) applied "for even viewing commercial speech as entitled to lesser protection, we find no basis under either *Glickman* or our other precedents to sustain the compelled assessments sought in this case." *United Foods,* 533 U.S. at 410, 121 S.Ct. 2334.

Before reaching a conclusion, the Supreme Court reviewed its *Glickman* precedent, which was made in 1997. In *Glickman,* the Supreme Court upheld a generic marketing program that was created during the depression era, which involved California fruit trees and which was in the context of a "collectivized" marketing order. According to the *United Foods* decision:

> In *Glickman* we stressed from the very outset that the entire regulatory program must be considered in resolving the case. In deciding that case we emphasized "the importance of the statutory context in which it arises." 521 U.S. at 469, 117 S.Ct. 2130. The California

tree fruits were marketed "pursuant to detailed marketing orders that ha[d] displaced many aspects of independent business activity." *Id.*, at 469, 521 U.S. 457, 117 S.Ct. 2130. Indeed, the marketing orders "displaced competition" to such an extent that they were "expressly exempted from the antitrust laws." *Id.*, at 461, 521 U.S. 457, 117 S.Ct. 2130. The market for the tree fruit regulated by the program was characterized by "[c]ollective action, rather than the aggregate consequences of independent competitive choices." *Ibid.* The producers of tree fruit who were compelled to contribute funds for use in cooperative advertising "d[id] so as a part of a broader collective enterprise in which their freedom to act independently [wa]s already constrained by the regulatory scheme." *Id.*, at 469, 521 U.S. 457, 117 S.Ct. 2130. The opinion and the analysis of the Court proceeded upon the premise that the producers were bound together and required by the statute to market their products according to cooperative rules. To that extent, their mandated participation in an advertising program with a particular message was the logical concomitant of a valid scheme of economic regulation.

*United Foods,* 533 U.S. at 412, 121 S.Ct. 2334.

In contrast, the *United Foods* case involved a mushroom industry which was not collectivized, which was not exempt from anti-trust laws, and was not the subject of an expansive marketing order. *Id.* at 412, 121 S.Ct. 2334. Thus, the Supreme Court rejected the application of *Glickman* and instead held that:

the mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity. *See, e.g., Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Keller v. State Bar of Cal.,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990).

*Id.* at 412, 121 S.Ct. 2334.

In the case of pork marketing, this case resembles *United Foods* much more so than *Glickman.* As in the case of mushroom production considered in *United Foods,* pork is not subject to a comprehensive and collectivized marketing order. There is no necessity for a mandated marketing approach as part of a specialized industry. As such, the Court will apply the rule in *United Foods.*

As noted above, the *United Foods* decision relied in part on the Supreme Court's *Keller* decision. *Keller* is the precedent which forbids a state bar (as to which membership is required to practice law) from charging mandatory dues to members and then using those dues to pay for political or ideological advocacy as to which some members object. Similar to the *Keller* decision, the instant case involves mandated fees which are directed toward a discrete occupation (hog producers) [13] and which fund speech as to which some producers have sincere philosophical, political and commercial disagreements. Even aside from the important political and philosophical objections to such speech, the commercial interests of objecting producers to such speech is ample. In days of low return on agriculture, the decision of an individual farmer to devote funds to uses other than generic advertising are

13. As part of the briefing Cross–Defendants have argued that the assessments are not directed at hog producers, but only the sale of hogs. This is a distinction without a difference. Hog producers, not others, sell hogs for slaughter. The assessments are directed toward them, just as surely as if the statutory language had branded their foreheads.

very important. Indeed, the frustration of some farmers are likely to only mount when those funds are used to pay for competitors' advertising, thereby depriving the farmer of the ability to pay for either niche advertising or non-advertising essentials (such as feed for livestock). This is true regardless of whether objecting farmers are correct in their economic analysis that the assessments and speech do not sufficiently further their own particular interests. In short, whether this speech is considered on either philosophical, political or commercial grounds, it involves a kind of outrage which Jefferson loathed. The government has been made tyrannical by forcing men and women to pay for messages they detest. Such a system is at the bottom unconstitutional and rotten.

For these reasons, the Court concludes that the mandated system of Pork Act assessments is unconstitutional since it violates the Cross-Plaintiffs' rights of free speech and association. *See also Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (discussing association rights); *Frame,* 885 F.2d at 1133–34; *LMA,* 207 F.Supp.2d at 1003–7; *Cal-Almond, Inc. v. Dept. of Agriculture,* 14 F.3d 429, 434–35 (9th Cir. 1993) (discussing issue in context of almond marketing order).

***Remedy***

Since the Court has granted Cross-Plaintiffs summary judgment as to liability, the question arises as to the scope of the necessary remedy. Cross-Plaintiffs have requested entry of a declaration, declaring the Pork Program unconstitutional, and the entry of an injunction, prohibiting the operation of the Pork Program and the collection of any assessments under the Pork Program. Plaintiffs and Governmental Defendants, however, argue that this scope of an injunction is much too broad. They urge that the Court should limit an injunction to a prohibition of making mandatory assessments against only the named Cross-Plaintiffs in this suit. This suggestion was contrary to the remedies ordered in *LMA* and *United Foods.*

It appears to the Court, as argued by Cross-Plaintiffs, that such a remedy would be at the least unwise. The Pork Act was written without severability provisions. This indicated an intent by Congress that the Act's provisions rise or fall when considering constitutionality. By making the Act a "voluntary" assessment as opposed to a "mandatory assessment," there is no assurance that the funds generated will be sufficient to support the infrastructure which Congress created to carry out the Act. This is a real concern in this case because the statute was enacted to require "mandatory" assessments precisely because the previous system of voluntary contributions would not support a sizable program. The provisions of the Pork Act are also intertwined. *See Hill v. Wallace,* 259 U.S. 44, 70–72, 42 S.Ct. 453, 66 L.Ed. 822 (1922) (holding that Futures Trading Act was wholly unconstitutional in light of its intertwined provisions and lack of a severability clause).

In this context, a limited injunction would essentially re-write the Act in a manner inconsistent with judicial interpretation. *See Eubanks v. Wilkinson,* 937 F.2d 1118, 1122 (6th Cir.1991) (citing *Blount v. Rizz,* 400 U.S. 410, 419, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971)); *LMA, supra.* Additionally, as a practical matter, such would be impossible in this case. No suggested mechanism has been provided for making future assessments voluntary for claimants. Indeed, the identity of all of CFF's members are not even known. Finally, such an approach appears simply wrong-headed in the context of a program with a significant lack of producer support, such as the current Pork Program. Therefore, the Court will approve the de-

claratory and injunctive relief requested by Cross–Plaintiffs. The Court finds that such equitable relief is not only supported by the substantive law, but also by the equitable factors which support injunctive relief.

While doing so, the Court will not make the ordered injunction effective until 30 days from the date of the Injunction. The purpose of this delay is to allow Governmental Defendants and Plaintiffs to exercise their rights to seek a stay under Federal Rule of Appellate Procedure 8. The Court also denies any request for stay by this Court, for the reasons stated in this Opinion, so that any further request for such may be made directly to the Court of Appeals.

### *CONCLUSION*

For the reasons stated, Cross–Plaintiffs' Motion for Summary Judgment and Motion to Dismiss Affirmative Defenses shall be granted, and the motions of the other parties denied. Further, for relief of Cross–Plaintiffs, the Court will grant declaratory relief declaring the Pork Act unconstitutional and enjoining the collection of Pork Act assessments and the operation of the Pork Check-off Program. This relief will be ordered as part of Final Judgment and Injunction since this disposition completes the adjudication of claims in this matter.

### *ORDER*

Upon further inspection of its Opinion of October 25, 2002, this Court determines that said Opinion should be corrected, pursuant to Federal Rule of Civil Procedure 60(a), to remedy clerical error.

**THEREFORE, IT IS HEREBY ORDERED** that the word "agricultural" on page 28, line 9 of the second full paragraph, is corrected to read "agriculture".

### *FINAL JUDGMENT AND INJUNCTION*

In accordance with the Opinion of this date;

**IT IS HEREBY ORDERED** that Cross–Plaintiffs Campaign for Family Farms, James Dale Joens, Richard Smith, Rhonda Perry and Lawrence Ginter's Motion for Summary Judgment (Dkt. No. 162) and Motion to Dismiss (Dkt. No. 170) are **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs Michigan Pork Producers, National Pork Producers Council, Pete Blauwikel, Bob Bloomer, High Lean Pork, Inc., California Pork Producers, Kentucky Pork Producers, Indiana Pork Producers, New York Pork Producers, and Ohio Pork Producers' Motion for Summary Judgment (Dkt. No. 182) and Motion to Strike (Dkt. No. 220) are **DENIED.**

**IT IS FURTHER ORDERED** that Governmental Defendants Secretary Ann Veneman and Administrator A.J. Yates' Motion for Summary Judgment (Dkt. No. 183) and Motion to Strike (Dkt. No. 199) are **DENIED.**

**IT IS FURTHER ORDERED** that the Court declares the Pork Production, Research and Consumer Education Act of 1985, 7 U.S.C. § 4801 *et seq.* to be unconstitutional.

**IT IS FURTHER ORDERED** that the Court enjoins Cross–Defendants Michigan Pork Producers, National Pork Producers Council, Pete Blauwikel, Bob Bloomer, High Lean Pork, Inc., California Pork Producers, Kentucky Pork Producers, Indiana Pork Producers, New York Pork Producers, Ohio Pork Producers, Secretary Ann Veneman and Administrator A.J. Yates and those acting for them as officers, agents, employees and contractors, to cease the collection of assessments under the Pork Act and to cease the operation of

the Pork Check-off Program effective 30 days from the issuance of this Final Judgment and Injunction.

**IT IS FURTHER ORDERED** that any request for stay of this Final Judgment and Injunction is **DENIED** and Cross-Defendants are directed to seek such stay, should they so desire, from the Court of Appeals.

**IT IS FURTHER ORDERED** that attorney fees may be sought as directed under Federal Rule of Civil Procedure 54(d).

**IT IS FURTHER ORDERED** that costs may be billed as directed under Local Civil Rule 54.1.